FILED
2017 Sep-14  AM 08:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRCIT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ANTONIO JONES,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | |
| | ) | **JURY DEMAND** |
| **SAVAGE SERVICES** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

---

## COMPLAINT

---

### I. JURISDICTION

1.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 1343(4). This is a suit authorized and instituted pursuant to Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended by the "Civil Rights Act of 1991, and 42 U.S.C. § 1981, as amended." The jurisdiction of this court is invoked to secure protection for and to redress the deprivation of rights secured by 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, providing injunctive and other relief against race discrimination and retaliation in employment.

## II. PARTIES

2.     Plaintiff, Antonio Jones, ("Plaintiff") is an African American citizen of the United States and is a resident of Lipscomb, Alabama.

3.     Defendant, Savage Services Corporation, ("Defendant") is a foreign corporation. The Defendant is engaged in business in Alabama.

4.     At all times relevant to this action, Defendant has maintained and operated a business in Alabama. Defendant is engaged in an industry affecting commerce and has fifteen (15) or more employees and is an employer within the meaning of 42 U.S.C. § 2000e (b), (g) and (h).

## III. ADMINISTRATIVE PROCEDURES

5.     Plaintiff hereby adopts and realleges paragraphs one (1) through four (4) herein above as if fully set forth herein.

6.     Plaintiff brings this action for the unlawful employment practices and acts of intentional discrimination by his employer, Defendant.

7.     This action seeks to redress unlawful employment practices resulting from the acts of Defendant, their agents, servants, and employees committed with respect to Plaintiff's employment; and for a permanent injunction restraining Defendant from maintaining a habit and/or practice of discriminating against and/or retaliating against the Plaintiff and others similarly situated on account of

racial discrimination.

8.     On November 9, 2015, within 180 days of the last discriminatory and retaliatory act of which Plaintiff complains, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Exhibit 1).

9.     Plaintiff's Notice of Right to Sue was mailed by the EEOC to the Plaintiff on June 15, 2017, and Plaintiff filed suit within ninety (90) days of receipt of his Notice of Right to Sue.  (Exhibit 2).

10.     Administrative prerequisites for filing suit have been satisfied, and Plaintiff is entitled to bring this action.

## IV.  STATEMENT OF PLAINTIFF'S FACTUAL ALLEGATIONS AND CLAIMS

11.      Plaintiff hereby adopts and realleges paragraphs one (1) through ten (10) herein above as if fully set forth herein.

12.     Plaintiff, Antonio Jones is an African American male over the age of eighteen (18).

13.     Plaintiff began working for the Defendant in or around June 2012 as a Fuel Tech.

14.     Plaintiff was terminated on or about July 2, 2015.

15.     At the time of Plaintiff's hire, the General Manager was Steve (LNU), Caucasian.

16.    When Plaintiff was hired Steve, the General Manager, printed several documents for Plaintiff to sign prior to training including a handbook acknowledgment.  However, Plaintiff was never given a copy of any handbook.

17.    Plaintiff's initial hire meeting with Steve, the General Manager, was rushed, as Steve wanted to get Plaintiff trained and working as soon as possible.

18.    The General Manager told Plaintiff to contact him if he had any problems and provided Plaintiff with a sheet of paper with telephone numbers he was to use should an issue arise.

19.    The General Manager instructed Plaintiff that the main issue to remember was to service the locomotives.

20.    Very shortly after Plaintiff was hired and began training, Plaintiff complained of race discrimination from his trainer and Caucasian Leadman, Randy Brisco.

21.    Mr. Brisco made racially offensive comments to Plaintiff and told Plaintiff that he did not like black churches because they did not help the neighborhood and only wanted the money for themselves.

22.    Plaintiff was offended by the comment, and complained to the General Manager that Mr. Brisco was a racist and he made racially offensive comments.

23.    Mr. Brisco made it known that he wanted Plaintiff's job to be offered

to a Caucasian applicant that was unable to pass the driving test.

24.     There was no investigation into Plaintiff's complaints of race discrimination.

25.     Russ Shinert, Caucasian, later replaced Steve as General Manager.

26.     In or around June 2015, Plaintiff complained to Mr. Shinert about the racial discrimination and racially offensive comments from Mr. Brisco because the discrimination continued after Plaintiff's initial complaints.

27.     Mr. Shinert refused to listen to Plaintiff's complaints and did nothing about the race discrimination.

28.     After Mr. Shinert ignored Plaintiff's complaint, Plaintiff attempted to get the telephone number for the corporate office or a hotline number to call and complain, but this request was refused.

29.     Plaintiff asked other employees if they had any phone numbers for the corporate office, but the telephone numbers provided by other employees were no longer good telephone numbers.

30.     Mr. Shinert had previously told Plaintiff that if he had any problems to go through Mr. Shinert.

31.     Also in or around June 2015, Plaintiff went into work and was told by Mr. Shinert and Mr. Brisco to sign a responsibility duties form because Mr. Brisco complained to Mr. Shinert about Plaintiff leaving trucks without fuel.   These

allegations regarding Plaintiff not performing his duties were false.

32.     The policy and practice was that if there were no engines to fuel, an employee could leave and they would call them to come back to fuel.

33.     In addition, if there were no trains to be serviced then employees had off time or down time.

34.     Each employee had off time or down time depending on whether the trucks were there and whether there were any trains to be serviced.

35.     Shortly after Plaintiff signed the responsibilities sheet Defendant made a new rule as to when workers had off/down time stating that when workers had off/down time they had to take fuel to the Birmingham location.

36.     Plaintiff had no issues with staying late to fuel a locomotive as he had previously worked late and fueled after 7:00 pm until he was told not to do so by his Leadman, Mr. Brisco.

37.     Jeff (LNU), Caucasian Tran Master, made false allegations about Plaintiff.  Chabanne Chester, African American Train Master told Plaintiff that Jeff, Caucasian Train Master, had trouble with black people and if a white fuel tech had been working instead of Plaintiff there would not have been a problem.

38.     On or about June 20, 2015, Plaintiff called Mr. Shinert to complain about race discrimination and to complaint that Jeff was unjustly singling out Plaintiff because of his race and other African American employees.

39.     Plaintiff on this occasion complained to Mr. Shinert that both Jeff and Mr. Brisco were racists.

40.     On or about July 2, 2015, Plaintiff had a telephone conference with Russ Shinert and Plaintiff was told he was terminated for stealing time.

41.     Steve told plaintiff at the beginning of his employment that he was to sign his daily timesheets for a full shift.

42.     Signing your daily timesheets for a full shift is a company wide standard of time keeping and Mr. Brisco, Plaintiff's trainer and Leadman, would often leave work when there was no locomotive to service.

43.     Plaintiff left work on many occasions at the same time as his Caucasian Leadman Mr. Brisco

44.     Mr. Brisco also completed all the timesheets for employees including Plaintiff's and required Plaintiff to sign them.

45.     In addition, Mr. Brisco was in charge of turning in the timecards.

46.     Mr. Brisco never raised any issues with the hours Plaintiff worked.

47.     On Plaintiff's last physical day of employment, Mr. Shinert, General Manager, told him to start using the eagle eye in the truck to clock in and out instead of having Mr. Brisco complete timesheets.

48.     This was the first time Plaintiff was instructed to use this new system to document his time.

49.     Plaintiff was terminated approximately twelve (12) after his last complaints of race discrimination.

## COUNT ONE

### STATEMENT OF PLAINTIFF'S TITLE VII AND 42 U.S.C. § 1981 RACE DISCRIMINATION CLAIMS/HARASSMENT/HOSTILE ENVIRONMENT CLAIMS

50.     Plaintiff hereby adopts and realleges paragraphs (1) through forty-nine (49) herein above as if fully set forth herein.

51.     Plaintiff, Antonio Jones is an African American.

52.     Plaintiff began working for the Defendant in or around June 2012 as a Part-Time Fuel Tech.

53.     Plaintiff was terminated on or about July 2, 2015.

54.     At the time of Plaintiff's hire, the General Manager was Steve (LNU).

55.     Steve printed several documents for Plaintiff to sign prior to training including a handbook acknowledgment; however, Plaintiff was never give a handbook.

56.     Plaintiff's meeting with Steve was rushed, as Steve wanted to get Plaintiff trained as soon as possible.

57.     Steve told Plaintiff to contact him if he had any problems and provided Plaintiff with a sheet of paper with telephone numbers he was to use should an issue arise.

58.     Steve told Plaintiff the main issue to remember was to service the locomotives.

59.     Very shortly after Plaintiff began training, he complained of race discrimination from his trainer and Caucasian Leadman, Randy Brisco.

60.     Mr. Brisco told Plaintiff that he did not like black churches because they did not help the neighborhood and only want money for themselves.

61.     Plaintiff was offended by the comment, and complained to Steve that Mr. Brisco was a racist and the he made racial comments towards him.

62.     Mr. Brisco wanted Plaintiff's job to be offered to a Caucasian applicant that was unable to pass the driving test.

63.     There was no investigation into Plaintiff's complaints of race discrimination.

64.     Russ Shinert, Caucasian, later replaced Steve as General Manager, unexpectedly.

65.     In or around June 2015, Plaintiff complained to Mr. Shinert about the racial discrimination and racially offensive comments from Mr. Brisco.

66.     Mr. Shinert refused to listen to Plaintiff's complaint.

67.     After Mr. Shinert ignored Plaintiff's complaint, Plaintiff attempted to get the telephone number for the corporate office or a hotline number to call and complain, but this request was refused.

68. Plaintiff asked other employees if they had any phone numbers for the corporate office, but the telephone numbers provided by other employees were no longer good telephone number.

69. Mr. Shinert had previously told Plaintiff that if he had any problems to go through Mr. Shinert.

70. Also in or around June 2015, Plaintiff went into work and was told by Mr. Shinert and Mr. Brisco to sign a responsibility duties form because Mr. Brisco complained to Mr. Shinert about Plaintiff without fuel. Those allegations were false.

71. The policy and practice was that if there were no engines to fuel, an employee could leave and they would call them to come back to fuel.

72. In addition, if there were no trains to be serviced then employees had off/down time.

73. Each employee had off/down time depending on whether the trucks were there and whether there were any trains to be serviced.

74. Shortly after Plaintiff signed the responsibilities sheet Defendant made a new rule as to when workers had off/down time stating that when workers had off/down time they had to take fuel to the Birmingham location.

75. Jeff (LNU), Caucasian Train Master, complained to Mr. Shinert that Plaintiff would not stay longer to fill up the trains.

76. This was false, as Plaintiff stated he would stay, but the train was on the wrong track and it could not be re-fueled as it was on the mainline.

77. The mainline is on an active track and employees were not allowed to fuel a locomotive on an active track because it is a serious safety issue.

78. Plaintiff asked Jeff to move the locomotive to one of the other lines and Jeff said he was going to call someone and refused to move to another track.

79. Plaintiff had no issues with staying late to fuel a locomotive as he had previously worked late and fueled after 7:00 pm until he was told not to do so by his Leadman, Mr. Brisco.

80. Mr. Brisco told Plaintiff it was his way or the highway.

81. Chabanne Chester, African American Train Master told Plaintiff that Jeff had trouble with black people and if a white fuel tech was there instead of Plaintiff there would not have been a problem.

82. On or about June 20, 2015, Plaintiff called Mr. Shinert to complaint about race discrimination and that Jeff was singling out Plaintiff and other African American employees.

83. Plaintiff complained that both Jeff and Mr. Brisco were racists.

84. On or about July 2, 2015, Plaintiff had a telephone conference with Russ Shinert and was told he was terminated for stealing time.

85. Steve told plaintiff at the beginning of his employment that he was to

sign his daily timesheets for a full shift.

86.    Signing your daily timesheets for a full shift is a company wide standard of time keeping and Mr. Brisco, Plaintiff's trainer and Leadman, would often leave work when there were no locomotive to service.

87.    Plaintiff left work on many occasions at the same time as his Leadman Mr. Brisco

88.    Mr. Brisco completed all the timesheets and required Plaintiff to sign them.

89.    In addition, Mr. Brisco was in charge of turning in the timecards.

90.    Mr. Brisco never raised any issues with the hours Plaintiff worked.

91.    On Plaintiff's last physical day of employment, Mr. Shinert, General Manager, told him to start using the eagle eye in the truck to clock in and out instead of having Mr. Brisco complete timesheets.

92.    This was the first time Plaintiff was instructed to use this new system to document his time.

93.    Plaintiff was terminated approximately twelve (12) after his last complaints of race discrimination.

94.    Similarly situated Caucasian employees, Tom (LNU) also left early when there were no locomotives to service and was not disciplined or terminated.

95.    Defendant subjected Plaintiff to racial discrimination because of his

race, African American.

96.   Plaintiff has been unjustly disciplined, subjected to racially offensive comments, forced to work in a racially hostile environment, discriminated against, treated differently, denied pay, denied time off, harassed, and terminated by Defendant because of his race, African American.

97.   Defendant has a habit and/or practice of discriminating against African-Americans, harassing African Americans and condoning and/or allowing racial discrimination and a racially hostile environment.

98.   Supervisors and managers employed by Defendant engaged in these unlawful practices, were aware these unlawful practices by other employees, encouraged and/or condoned these unlawful practices.

99.   Defendant failed to train its employees on its purported antidiscrimination/antiharassment policies and reporting procedures.

100.   Defendant's dissemination of any antidiscrimination/antiharassment policies and reporting procedures has been ineffective.

101.   Plaintiff has been directly affected by the racially discriminatory and racially harassing practices described in this Complaint.

102.   Defendant's conduct and the conduct of its employees was so severe or pervasive as to create a racially hostile working environment to which Plaintiff was subjected.

103.   Defendant knew or should have known of the racial discrimination and racial harassment Plaintiff was forced to endure.

104.   Defendant failed to take any prompt and effective action reasonably calculated to result in the prevention of and/or remedy of the racial discrimination and racial harassment/hostile environment Plaintiff was forced to endure.

105.   Defendant's actions were and continue to be malicious and Plaintiff has been harmed.

106.   Defendant's actions were and continue to be in reckless disregard of Plaintiff's federally protected rights.

107.   Defendant's actions are in violation of Title VII of the "Civil Rights Act of 1964," as amended and 42 U.S.C. § 1981, as amended.

108.   The Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit for back pay, front pay, compensatory damages, punitive damages, attorney's fees, expenses, costs, injunctive relief, and declaratory judgment is his only means of securing adequate relief.

109.   Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful policies and practices set forth herein unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that this Court adopt jurisdiction of this action and award Plaintiff the following relief:

a.      Enter a declaratory judgment that Defendant's policies, practices and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by Title VII of the "Civil Rights Act of 1964," as amended, and 42 U.S.C. § 1981, as amended;

b.      Grant Plaintiff a permanent injunction enjoining Defendant's, their Agents, Successors, Employees, Attorneys, and those acting in concert with Defendant or at Defendant's request from violating Title VII of the "Civil Rights of 1964," as amended, and 42 U.S.C. § 1981, as amended;

c.      Grant Plaintiff an Order requiring Defendant make him whole by granting appropriate declaratory relief, compensatory damages (including damages for mental anguish), punitive damages, interest, attorney's fees, expenses, costs; and

d.      Plaintiff prays for such other, further, different or additional relief and benefits as justice may require.

## COUNT TWO

### STATEMENT OF PLAINTIFF'S TITLE VII AND 42 U.S.C. § 1981 RETALIATION CLAIMS

110.     Plaintiff hereby adopts and realleges paragraphs (1) through forty-nine (49) herein above as if fully set forth herein.

111.     Plaintiff, Antonio Jones is an African American.

112.     Plaintiff began working for the Defendant in or around June 2012 as a Part-Time Fuel Tech.

113.     Plaintiff was terminated on or about July 2, 2015.

114.     At the time of Plaintiff's hire, the General Manager was Steve (LNU).

115.     Steve printed several documents for Plaintiff to sign prior to training including a handbook acknowledgment; however, Plaintiff was never give a handbook.

116.     Plaintiff's meeting with Steve was rushed, as Steve wanted to get Plaintiff trained as soon as possible.

117.     Steve told Plaintiff to contact him if he had any problems and provided Plaintiff with a sheet of paper with telephone numbers he was to use should an issue arise.

118.     Steve told Plaintiff the main issue to remember was to service the locomotives.

119.     Very shortly after Plaintiff began training, he complained of race discrimination from his trainer and Caucasian Leadman, Randy Brisco.

120.     Mr. Brisco told Plaintiff that he did not like black churches because

they did not help the neighborhood and only want money for themselves.

121.     Plaintiff was offended by the comment, and complained to Steve that Mr. Brisco was a racist and the he made racial comments towards him.

122.     Mr. Brisco wanted Plaintiff's job to be offered to a Caucasian applicant that was unable to pass the driving test.

123.     There was no investigation into Plaintiff's complaints of race discrimination.

124.     Russ Shinert, Caucasian, later replaced Steve as General Manager, unexpectedly.

125.     In or around June 2015, Plaintiff complained to Mr. Shinert about the racial discrimination and racially offensive comments from Mr. Brisco.

126.     Mr. Shinert refused to listen to Plaintiff's complaint.

127.     After Mr. Shinert ignored Plaintiff's complaint, Plaintiff attempted to get the telephone number for the corporate office or a hotline number to call and complain, but this request was refused.

128.     Plaintiff asked other employees if they had any phone numbers for the corporate office, but the telephone numbers provided by other employees were no longer good telephone number.

129.     Mr. Shinert had previously told Plaintiff that if he had any problems to go through Mr. Shinert.

130.    Also in or around June 2015, Plaintiff went into work and was told by Mr. Shinert and Mr. Brisco to sign a responsibility duties form because Mr. Brisco complained to Mr. Shinert about Plaintiff without fuel.   Those allegations were false.

131.    The policy and practice was that if there were no engines to fuel, an employee could leave and they would call them to come back to fuel.

132.    In addition, if there were no trains to be serviced then employees had off/down time.

133.    Each employee had off/down time depending on whether the trucks were there and whether there were any trains to be serviced.

134.    Shortly after Plaintiff signed the responsibilities sheet Defendant made a new rule as to when workers had off/down time stating that when workers had off/down time they had to take fuel to the Birmingham location.

135.    Jeff (LNU), Caucasian Train Master, complained to Mr. Shinert that Plaintiff would not stay longer to fill up the trains.

136.    This was false, as Plaintiff stated he would stay, but the train was on the wrong track and it could not be re-fueled as it was on the mainline.

137.    The mainline is on an active track and employees were not allowed to fuel a locomotive on an active track because it is a serious safety issue.

138.    Plaintiff asked Jeff to move the locomotive to one of the other lines

and Jeff said he was going to call someone and refused to move to another track.

139.     Plaintiff had no issues with staying late to fuel a locomotive as he had previously worked late and fueled after 7:00 pm until he was told not to do so by his Leadman, Mr. Brisco.

140.     Mr. Brisco told Plaintiff it was his way or the highway.

141.     Chabanne Chester, African American Train Master told Plaintiff that Jeff had trouble with black people and if a white fuel tech was there instead of Plaintiff there would not have been a problem.

142.     On or about June 20, 2015, Plaintiff called Mr. Shinert to complaint about race discrimination and that Jeff was singling out Plaintiff and other African American employees.

143.     Plaintiff complained that both Jeff and Mr. Brisco were racists.

144.     On or about July 2, 2015, Plaintiff had a telephone conference with Russ Shinert and was told he was terminated for stealing time.

145.     Steve told plaintiff at the beginning of his employment that he was to sign his daily timesheets for a full shift.

146.     Signing your daily timesheets for a full shift is a company wide standard of time keeping and Mr. Brisco, Plaintiff's trainer and Leadman, would often leave work when there were no locomotive to service.

147.    Plaintiff left work on many occasions at the same time as his Leadman Mr. Brisco

148.    Mr. Brisco completed all the timesheets and required Plaintiff to sign them.

149.    In addition, Mr. Brisco was in charge of turning in the timecards.

150.    Mr. Brisco never raised any issues with the hours Plaintiff worked.

151.    On Plaintiff's last physical day of employment, Mr. Shinert, General Manager, told him to start using the eagle eye in the truck to clock in and out instead of having Mr. Brisco complete timesheets.

152.    This was the first time Plaintiff was instructed to use this new system to document his time.

153.    Plaintiff was terminated approximately twelve (12) after his last complaints of race discrimination.

154.    Similarly situated Caucasian employees, Tom (LNU) also left early when there were no locomotives to service and was not disciplined or terminated

155.    There is a habit and/or pattern of retaliation.

156.    Defendant subjected Plaintiff to adverse treatment with respect to the terms and conditions of his employment and terminated Plaintiff in retaliation for his complaints and protected activity.

157.    There is a causal connection between Plaintiff's complaints and the

adverse actions he has been forced to endure.

158.   Plaintiff has been unjustly disciplined, denied pay, and terminated in retaliation for his complaints and protected activity.

159.   Defendant has a habit and/or practice of retaliating against employees that complain and engage in protected activity.

160.   Supervisors and managers employed by Defendant engaged in these unlawful retaliatory practices, encouraged and/or condoned these unlawful practices.

161.   Defendant failed to train its employees on its purported antiretaliation policies and reporting procedures.

162.   Defendant's dissemination of any antiretaliation policies and reporting procedures has been ineffective.

163.   Plaintiff has been directly affected by the retaliatory practices described in this Complaint.

164.   Defendant's conduct and the conduct of its employees were so severe or pervasive as to create a retaliatory harassing working environment to which Plaintiff was subjected.

165.   Defendant knew or should have known of the retaliation Plaintiff was forced to endure.

166.   Defendant failed to take any prompt and effective action reasonably

calculated to result in the prevention of and/or remedy of the retaliation Plaintiff was forced to endure.

167. Defendant condoned the illegal retaliation.

168. Defendant's retaliatory actions discouraged employees from complaining and engaging in protected activity.

169. Defendant's actions were and continue to be malicious and Plaintiff has been harmed.

170. Defendant's actions were and continue to be in reckless disregard of Plaintiff's federally protected rights.

171. Plaintiff avers that he has been unjustly harassed, unjustly disciplined, denied pay, disciplined and retaliated against, and terminated for engaging in a protected activity, and that there is a causal link between Plaintiff engaging in a protected activity and the adverse actions he suffered, including his termination.

172. Plaintiff has been retaliated against in violation of Title VII of the "Civil Rights Act of 1964," as amended, and 42 U.S.C. § 1981, as amended.

173. Defendant has a habit and/or practice of retaliating against employees that engage in protected activity.

174. Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for back pay, front pay, compensatory damages, punitive damages, attorney's fees, injunctive relief and declaratory

judgment is his only means of securing adequate relief.

175.   Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff requests that this Court adopt jurisdiction of this action and award Plaintiff the following relief:

a.   Enter a declaratory judgment that Defendant's policies, practices and procedures complained of herein have violated and continue to violate the rights of the Plaintiff as secured by Title VII of the "Civil Rights Act of 1964," as amended, and and 42 U.S.C. § 1981, as amended;

b.   Grant Plaintiff a permanent injunction enjoining Defendant's, their Agents, Successors, Employees, Attorneys, and those acting in concert with Defendant or at Defendant's request from violating Title VII of the "Civil Rights of 1964," as amended, and 42 U.S.C. § 1981, as amended;

c.   Grant Plaintiff an Order requiring Defendant make him whole by granting appropriate declaratory relief, compensatory damages (including damages for mental anguish), punitive damages, interest, attorney's fees, expenses, costs; and

d.   Plaintiff prays for such other, further, different or additional relief and

benefits as justice may require.

## PLAINTIFF DEMANDS TRIAL BY STRUCK JURY

CYNTHIA FORMAN WILKINSON
State Bar ID No:  ASB-9950-L68C
Attorney for Plaintiff

**OF COUNSEL:**

**WILKINSON LAW FIRM, PC**
215 N. Richard Arrington Jr. Blvd.
Suite 200
Birmingham, Alabama 35203
Tel.:  (205) 250-7866
Fax:  (205) 250-7869
E-mail: wilkinsonefile@wilkinsonfirm.net

**PLAINTIFF'S ADDRESS**:

Mr. Antonio Jones
c/o WILKINSON LAW FIRM, PC
215 North Richard Arrington, Jr. Blvd.
Suite 200
Birmingham, Alabama 35203

**PLEASE SERVE DEFENDANT AT THE FOLLOWING ADDRESS:**

Savage Services Corporation
c/o CT Corporation System
2 North Jackson Street, Ste. 605
Montgomery, AL 36104